Case No. 22-1387

## UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

**Antoinette Buggs**

*Plaintiff-Appellant,*

v.

**FCA US, LLC**

*Defendant-Appellee.*

On Appeal from the United States District Court
For the Eastern District of Michigan

No. 20-10218 (Honorable Nancy G. Edmunds, *presiding*)

_____

## APPELLANT ANTOINETTE BUGGS' CORRECTED BRIEF ON APPEAL

_____

Stephen M. Lovell (P80921)
**Ernst Charara & Lovell, PLC**
645 Griswold St., Ste. 4100
Detroit, Michigan 48226
(313) 965-5555
Attorneys for Appellant

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-1387            Case Name: Antoinette Buggs v. FCA US, LLC

Name of counsel: Stephen M. Lovell (P80921)

Pursuant to 6th Cir. R. 26.1, Antoinette Buggs
                              *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
    identity of the parent corporation or affiliate and the relationship between it and the named
    party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
    in the outcome? If yes, list the identity of such corporation and the nature of the financial
    interest:

No.

### CERTIFICATE OF SERVICE

I certify that on _____ May 23, 2022 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Stephen M. Lovell (P80921)
645 Griswold St., Ste. 4100
Detroit, MI 48226

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# **TABLE OF CONTENTS**

Table of Authorities…………………………………………….…............... iv

Statement of Jurisdiction…………………………………..…………....………vi

Statement of Issues Presented……………………………..………...………....vii

Statement of the Case…………………………………………..……………..1

Summary of the Argument………………………….……...………………..15

Standards of Review…………………………………..…..……………………15

Argument…………………………………………….……………………16

Conclusion……………………………………………….……………….28

## <u>Table of Authorities</u>

**Cases**

*Albertson, Inc. v. Kirkingburg*, 527 U.S. 555 (1999)................................................18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................15

*Bryson v. Regis Corp*., 498 F.3d 561 (6th Cir. 2007) ............................................25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).......................................................16

*Cummings v. Dean Transp., Inc.*, 9 F. Supp. 3d 795 (E.D. Mich. 2014)...............22

*Dietelbach v. Ohio Edison Co.*, 1 Fed. App'x 435 (6th Cir. 2001).......................22

*Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012) .............................................17

*EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089 (6th Cir. 1998)......................17

*Estate of Mauro v. Borgess Med. Cen.*, 137 F.3d 398 (6th Cir. 1998)...................17

*Feick v County of Monroe*, 229 Mich App 335 (1998)...........................................25

*Hendricks-Robinson v Excel Corp*, 154 F3d 685 (CA 7, 1998).......................18, 23

*Howard v Mich Dep't of Corrections*, 2013 Mich. App. LEXIS 844 (2013)..........19

*Hurtt v. International Services, Inc*., 627 Fed. App'x 414 (6th Cir. 2015) ......19, 25

*International Bhd of Teamsters v United States,* 431 US 324 (1997)....................25

*Johnson v Kroger Co*, 319 F3d 858 (6th Cir 2003).................................................25

*Keller v BD of Educ*., 182F. Supp. 2d 1148 (D.N.M. 2001)...................................21

*Lewis v. Humboldt Acquisition Corp*., 681 F.3d 312 (6th Cir. 2012)................... 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986).............16

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ..............................25, 26

*Peden v. City of Detroit*, 470 Mich. (2004) ...........................................................25

*Richards v American Axle & Manuf'g, Inc*, 84 F. Supp. 2d 862 (ED MI, 2000)....18

*Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014) ..........................................25

*Sanchez v Lagoudakis*, 440 Mich. 496; 486 N.W.2d 657 (1992)...........................20

*School Bd of Nassau Co v Arline*, 480 U.S. 273 (1987)..........................................20

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998)...........................................16

*Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010)....................................26

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)...........................................18

*Swann v. Washtenaw County*, 221 F. Supp. 3d 936 (E.D. Mich 2016) .................17

*Taylor v Principal Financial Group, Inc*, 93 F3d 155 (CA 5, 1996).....................18

*Whitfield v. Tennessee*, 629 F.3d 253 (6th Cir. 2011) ............................................19

*Wilson v. Chrysler Corp.*, 172 F.3d 500 (7th Cir. 1999)........................................18

## Statutes

42 U.S.C. § 12101.....................................................................................................14

MCL 37.1103(d)(i)(A) ..............................................................................................20

MCL 37.1103(e) ........................................................................................................20

## Other Authorities

29 C.F.R. § 1630.2(k)(1)...........................................................................................20

Fed. R. Civ. P. 56 .....................................................................................................15

## **Statement of Jurisdiction**

The Sixth Circuit Court of Appeals has jurisdiction over this appeal and same is proper under 28 U.S.C. § 1291, as the District Court's Order, RE 27, Page ID # 741-755, constitutes a Final Order. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), Appellant timely filed her Notice of Appeal with the District Court within 30 days after entry of the District Court's March 29, 2022 Order, RE 31, Page ID # 764.

## <u>Statement of Issues Presented</u>

**ISSUE ONE:** Whether Appellant's failure to accommodate claims under the ADA and PWDCRA should have been dismissed where Appellant showed sufficient evidence to establish a question of material fact as to whether she is disabled, qualified for her position, and was denied a reasonable accommodation?

**ISSUE TWO:** Whether Appellant's discrimination claims under the ADA and PWDCRA should have been dismissed where Appellant showed sufficient evidence to establish a question of material fact as to whether she is disabled, otherwise qualified for her position, and she can demonstrate that but for her carpal tunnel syndrome she would not have suffered an adverse employment action?

**ISSUE THREE:** Whether Appellant's retaliation claims under the ADA and PWDCRA should have been dismissed where there is sufficient evidence to establish a question of material fact as to whether but for Appellant's protected activity, Appellee would not have taken an adverse action against Appellant?

**ISSUE FOUR:** Whether Appellant's discrimination and retaliation claims under the ADA and PWDCRA should have been dismissed where there is sufficient evidence to establish a question of material fact as to whether Appellant can establish pretext?

# I. STATEMENT OF THE CASE

## A. Appellant's Job History

Appellant began working as a Temporary Part-Time employee ("TPT") for FCA in June 2015. Transcript, RE 23-2, Page ID # 542. Appellant worked on the assembly line at JNAP. *Id*. As a TPT, Appellant did not have regular employee status or seniority. Transcript, RE 23-2, Page ID # 543. She served as a replacement worker for employees who were absent or on vacation. Transcript, RE 23-2, Page ID # 543. While a TPT, Appellant was primarily assigned to Team 41 on the door line. Transcript, RE 23-2, Page ID # 543. Team 41 encompassed about six or seven different assembly jobs. Transcript, RE 23-2, Page ID # 543. As a TPT, Appellant usually did the "panel secure" job, which required her to use hand drills to apply screws to secure the panel to the door. Transcript, RE 23-2, Page ID # 543. At times, she also performed a door tester job that required use of a hand drill. Transcript, RE 23-2, Page ID # 543, 563.

Appellant received a promotion to a regular full-time employee as of March 5, 2018. Transcript, RE 23-2, Page ID # 545. Appellee's employee, Donna Langford Reed, first became Appellant's supervisor on or about February 28, 2018 and supervised her until approximately June 5, 2019. Transcript, RE 23-2, Page ID # 585. Ms. Reed subjected Appellant to disability discrimination, which is explained more fully below. Transcript, RE 23-2, Page ID # 546.

1

**B. Medical Issues and Disability**

Near the end of July, 2016, Appellant began experiencing issues with pain in her hands. Transcript, RE 23-2, Page ID # 549. She had no such issues before her employment at FCA.  Transcript, RE 23-2, Page ID # 543.  After Appellant began experiencing issues with her hands and upon returning to work from a brief absence, she provided the JNAP Medical Department with a return to work note from her doctor dated July 27, 2016.  Transcript, RE 23-2, Page ID # 549; Return to Work Note 7/27/16, RE 23-3, Page ID # 590. The note said that Appellant might have carpal tunnel syndrome and should be restricted from doing any "*gripping, drilling, and using hand tools*" until November 15, 2016. *Id*. The Medical Department accordingly put Appellant's restrictions into the Company's computer system that tracks employees' work restrictions and Appellant's supervisor is informed of the restriction.  Transcript, RE 23-2, Page ID # 549; Transcript, RE 23-4, Page ID # 597.

As a result of her restrictions, Appellant was unable to perform the functions of the panel secure job and given a 30 day leave because there were no positions available for her that would meet her restrictions. RE 23-2, Page ID # 549.  A few weeks later, Appellant went to her doctor and requested that she be cleared to return to work and was diagnosed with bilateral carpel tunnel syndrome.  RE 23-2, Page ID # 549-50; Return to Work Note 08/19/16, RE 23-5, Page ID # 605.

Appellant returned to work but quickly determined that she still could not do any lifting or use hand tools and therefore informed the Company that she was unable to perform any of the available assembly jobs due to her disability. Transcript, RE 23-2, Page ID # 550.  Appellant was told by her supervisor that she could not return to work until she had surgery for her disability.  *Id*.

While off work, Appellant submitted a request for intermittent FMLA leave in August, 2016.  Transcript, RE 23-2, Page ID # 551; 08/23/16 FMLA, RE 23-6, Page ID # 607-08.   Appellant sought intermittent FMLA leave of two to three episodes per month and one day per episode for symptoms related to her previous stroke. The Company approved Appellant's intermittent FMLA leave request from June 10, 2016 until December 31, 2016 based on "a serious health condition that makes you unable to perform the essential functions of [her] job"; however, she never needed to use FMLA leave during that time. Transcript, RE 23-2, Page ID # 551; 08/23/16 FMLA, RE 23-6, Page ID # 607-08

Appellant had two surgeries, one on each hand in October and in December, 2016.  Transcript, RE 23-2, Page ID # 551.  Appellant returned to work from her surgeries on January 30, 2017.  Transcript, RE 23-2, Page ID # 552; 01/26/17 Physical Status Report, RE 23-7, Page ID #  610. Upon her return to work, Appellant presented with restrictions on her right hand but no work restrictions due

to the type of work she was doing.  01/26/17 Physical Status Report, RE 23-7,
Page ID # 610.

In June of 2017, Appellant again requested intermittent FMLA leave.
Transcript, RE 23-2, Page ID # 553; 06/13/17 FMLA, RE 23-8, Page ID # 612.
Appellant's request was denied because she was ineligible for FMLA leave. She
had not worked the requisite 1250 hours in the preceding twelve (12) months. *Id*.
Appellant was taken off of her job doing panel secure and was moved to the rear
door panel in July, 2017 which she had not been medically evaluated to do and
which went against the restrictions to her right hand. Transcript, RE 23-2, Page ID
# 553-54.  Appellant ended up further injuring her hand doing the rear door panel
job.  Transcript, RE 23-2, Page ID # 553-55; Work Injury Statement, RE 23-9,
Page ID # 614.  However, there are no records of Appellant having any issues
performing her job on Team 41 following the July, 2017 injury.

Appellee FCA hired Appellant to a regular full-time job effective March 5,
2018.  Transcript, RE 23-2, Page ID # 545.  Donna Langford Reed became
Appellant's immediate supervisor just a few days earlier, on February 28, 2018.
Transcript, RE 23-2, Page ID # 546.  From the outset, Ms. Reed made Appellant
work on jobs that were outside of her abilities due to the carpel tunnel she suffered
in both hands. 03/12/18 Statement, RE 23-10, Page ID # 616-17.  In her statement,
Appellant claimed that on March 10, 2018, Ms. Reed moved her from Team 41 on

the door line to Team 38, working on a window seal job – a job she could not do because of her carpal tunnel surgery and she informed Ms. Reed of this. Transcript, RE 23-2, Page ID # 558; 03/12/18 Statement, RE 23-10, Page ID # 616-17. Appellant had restrictions that prevented her from doing that specific job. Transcript, RE 23-2, Page ID # 558.

After attempting to work the window seal job on March 10, 2018, Appellant went to the plant Medical Department and informed them that she has carpel tunnel and told Ms. Reed that she was unable to do the job assigned to her. Transcript, RE 23-2, Page ID # 558-59; Medical Encounters, RE 23-11, Page ID # 623. The Medical Department provided her with wrist wraps, biofreeze, and over-the-counter medication. *Id.* Appellant continued to try to do the job but was having difficulty and medical could not offer her braces for her wrists. Transcript, RE 23-2, Page ID # 559; 03/12/18 Statement, RE 23-10, Page ID # 616-17. A union steward and union safety rep suggested that Appellant go home to get her braces so that she could do the job. *Id.* Appellant then overhead Ms. Reed telling other management employees that she was going to suspend Appellant for 30 days if she required any restrictions. Transcript, RE 23-2, Page ID # 560; 03/12/18 Statement, RE 23-10, Page ID # 616-17. When Appellant returned with her braces, she was put on notice by Ms. Reed, which meant that Appellant could be written up and

subject to discipline if anything else happened.  Transcript, RE 23-2, Page ID # 561; 03/12/18 Statement, RE 23-10, Page ID # 616-17.

The following day, Appellant was again put in Team 38 even though the job caused her to have to go to medical the day before, Appellant informed Ms. Reed that she could not do the job on Team 38 due to her carpel tunnel syndrome. *Id*. Ms. Reed then sent Appellant home and no reason was given for why Appellant was forced to leave and lose out on her pay for the day.  *Id*.  Appellant continued to be harassed by Ms. Reed on a daily basis and felt she was being forced to work in a hostile work environment.  03/12/18 Statement, RE 23-10, Page ID # 616-17.

On March 15, 2018, Appellant was again put on a job that she was unable to do due to her disability.  03/16/18 Statement, RE 23-12, Page ID # 627.  There were jobs available for Appellant to do within her limitations and Appellant had worked various jobs with little aggravation to her carpal tunnel.  *Id*.  After Appellant complained to Ms. Reed that she could not do the job due to her disability, Appellant was put on a two person job by herself, which she was also unable to do.  *Id*.  Appellant was then moved to another job where she was being trained by another employee who was doing half the job.  *Id*.  Even though Appellant was still being trained, Ms. Reed informed her that she had to do the entire job herself, which she was unable to do.  *Id*.  Appellant's team leader even tried to tell Ms. Reed that there were jobs available that Appellant could do but Ms.

Reed refused to move Appellant and put other employees in the open spots. *Id.* Appellant again had to go to plant Medical Department on March 15, 2018 for the same complaint related to her disability. Medical Encounters, RE 23-11, Page ID # 623.

When Appellant returned from medical, she was informed that Ms. Reed intended to have her fired and would do so if Appellant continued to require trips to the Medical Department while on probation. 03/16/18 Statement, RE 23-12, Page ID # 627. Appellant continued to come into work and be assigned jobs by Ms. Reed that she was unable to do. *Id.*

In order to try and protect herself after being informed of Ms. Reed's intention to have her fired, on March 16, 2018, Appellant presented the Medical Department with a note from an urgent care center stating that she was restricted from lifting more than 5 pounds for two weeks but that assembly and hand tools were otherwise okay. 03/16/18 Doctor's Note, RE 23-13, Page ID # 629. On March 26, 2018, Appellant presented another doctor's note indicating she could do "no gripping, hand tools are okay, nothing over five pounds" for the period from March 26, 2018 through June 26, 2018 due to carpel tunnel syndrome. Transcript, RE 23-2, Page ID # 561-62; 03/26/18 Return to Work Note, RE 23-14, Page ID # 631.

Following the written restrictions, Appellant stayed on the panel secure job after her union came to an agreement with Appellee FCA's management and Ms. Reed.   Transcript, RE 23-2, Page ID # 565. However, on June 13, 2018, Appellant's drill stopped working, and Ms. Reed asked her to use a heavier, secondary drill to do the panel secure job.  Transcript, RE 23-2, Page ID # 564-66; 06/14/18 Statement, RE 23-15, Page ID # 633-35.   Appellant refused to use the drill because it was against her restrictions and Ms. Reed told Appellant that she was going to kick her off the team.  Transcript, RE 23-2, Page ID # 564; 06/14/18 Statement, RE 23-15, Page ID # 633-35.  Ms. Reed attempted to take Appellant off of the line and send her to medical and Appellant had to get her union steward involved.  Transcript, RE 23-2, Page ID # 564-65; 06/14/18 Statement, RE 23-15, Page ID # 633-35.

 The following day, Appellant was working her job when Ms. Reed told Appellant that she needed to go to medical and that there was no work available for her.  Transcript, RE 23-2, Page ID # 565; 06/14/18 Statement, RE 23-15, Page ID # 633-35.  Appellant explained that she could do her job and did not need to go to medical.  *Id*.  Appellant had the same restrictions since March 26, 2018.  03/26/18 Return to Work Note, RE 23-14, Page ID # 631.  Appellant was then told there would be no job available for her for 30 days.  Transcript, RE 23-2, Page ID # 566. After being told she could not work for 30 days, Appellant returned to her doctor

and he removed the no-gripping restriction. Appellant's new restrictions provided for limited gripping up to five hours a day, no heavy duty drills, and no lifting over five pounds.  Transcript, RE 23-2, Page ID # 566; 06/18/18 Return to Work Note, RE 23-16, Page ID # 637. Appellant also applied for intermittent FMLA leave related to carpal tunnel syndrome in June of 2018. Transcript, RE 23-2, Page ID # 567-68; 06/20/18 FMLA, RE 23-17, Page ID # 639-54. She was approved for intermittent leave of up to two days per week with a duration of up to three days per episode.  06/18/18 Return to Work Note, RE 23-16, Page ID # 637.

Ms. Reed's harassment of Appellant continued over the next several months. On August 23, 2018, Appellant was accused by Ms. Reed of damaging a panel and put on notice.  Transcript, RE 23-2, Page ID # 568; 08/23/18 Statement, RE 23-18, Page ID # 656. Appellant explained that she could not have caused the damage and that she did not know who did.  Transcript, RE 23-2, Page ID # 568.  Appellant was also harassed about how she did her job even though other employees did the job the exact same way and were not subject to harassment by Ms. Reed.  09/13/18 Statement, RE 23-19, Page ID # 658-59.

Appellant provided Appellee FCA with another doctor's letter with slightly different restrictions in September, 2018.  Transcript, RE 23-2, Page ID # 575; 09/21/18 Return to Work Note, RE 23-20, Page ID # 661.  Appellant's restrictions were now "activity as tolerated, not >5 lbs, limited hand tools." *Id*.  Appellant had

complained about the harassment by Ms. Reed and Appellee's failure to follow her restrictions to Arkena Willis from Human Resources.  Transcript, RE 23-2, Page ID # 574. After nothing was done by Appellee FCA to assist Appellant and her harassment continued, Appellant filed an EEOC Charge alleging that she was being harassed by her supervisor and that she had submitted a reasonable accommodation request after the litany of harassment she had suffered. Transcript, RE 23-2, Page ID # 574; EEOC Charge, RE 23-21, Page ID # 663.  Appellant told Ms. Willis that she had filed the EEOC complaint and again explained the various issues with Ms. Reed.  Transcript, RE 23-2, Page ID # 574.

Appellant continued to have issues with Ms. Reed after filing her EEOC complaint and speaking with Ms. Willis.  Appellant had been working the same job for months with no issues.  Transcript, RE 23-2, Page ID # 576.  However, Appellee FCA switched the drill that was used for the panel job and the new drill hurt Appellant and was no longer within her restrictions.  Transcript, RE 23-2, Page ID # 577; 11/14/18 Statement, RE 23-22, Page ID # 665-66. Once Appellant informed Ms. Reed that the drill hurt her hand and was outside of her restrictions, Ms. Reed began putting Appellant into the panel secure job more often.  11/14/18 Statement, RE 23-22, Page ID # 665-66.  Appellant had to go to medical on November 3 and 8, 2018 due to the drill being too heavy and causing her pain. Medical Encounters, RE 23-11, Page ID # 625.

On November 9, 2018, Appellant was working on the door tester job because of the new drill violating her restrictions.  Transcript, RE 23-2, Page ID # 576; 11/14/18 Statement, RE 23-22, Page ID # 665-66. Ms. Reed brought another employee in to do the door tester job and put Appellant back on the door panel secure job, which required her to use a drill outside of her restrictions.  *Id*.  The operations manager had to be involved to resolve the situation and a union grievance was filed for a hostile work environment due to Ms. Reed's behavior.  11/14/18 Statement, RE 23-22, Page ID # 665-66; Grievance, EFC No. 23-23, Page ID # 668.

In March of 2019, Appellant provided another doctor's note continuing her restrictions of "limited use" of vibratory tools and no lifting anything over 5 pounds. Transcript, RE 23-2, Page ID # 576; 03/20/19 Return to Work Note, RE 23-24, Page ID # 670.  Appellant also continued to have approved intermittent FMLA leave that she used for absences and to leave mid-shift, if her hands/wrists were bothering her.  Transcript, RE 23-2, Page ID # 579.

Shortly after Appellant was approved for her intermittent FMLA leave, Ms. Reed would delay her in being able to leave.  This happened on multiple occasions where Appellant was delayed anywhere from thirty minutes to several hours.  Transcript, RE 23-2, Page ID # 579, 581.  While Appellee FCA claims that it was Ms. Reed's friend who failed to inform her of Appellant's requests, this is

11

contradicted by the fact that even when Appellant told Ms. Reed directly that she needed to leave, she was still delayed. Transcript, RE 23-2, Page ID # 581. Appellant even complained about this to Ms. Willis in Human Resources who informed the lead labor relations supervisor that Ms. Reed had been delaying allowing Appellant to leave for FMLA. Email Regarding Leave, RE 23-25, Page ID # 672-73. And although Ms. Willis and Ms. Capers claimed that this issue was discussed with Ms. Reed, Ms. Reed claims that no one at FCA ever spoke with her about Appellant's complaint or at any time about employees having to wait to go on FMLA. Transcript, RE 23-4, Page ID # 598; Transcript, RE 23-26, Page ID # 679; Transcript RE 23-27, Page ID # 390.

While working in the Quality department, Appellant re-applied for intermittent FMLA leave on or about July 31, 2019. Her request was for absences up to three times per week with a duration of up to 1-2 days per episode and for appointments every 2-3 months. Transcript, RE 23-2, Page ID # 583; 08/01/19 FMLA, RE 23-28, Page ID # 694-99. On August 1, 2019, Sedgwick, the Company's Third Party FMLA Administrator, sent Appellant a letter regarding her FMLA claim. Transcript, RE 23-2, Page ID # 583; 03/20/19 Return to Work Note, RE 23-24, Page ID # 670. The letter informed Appellant that her treating provider had not properly completed the Provider Certification because he failed to identify a duration for the leave. Sedgwick advised Appellant that her provider needed to

provide the required information by August 11, 2019 or her claim may be denied. *Id.*

A corrected FMLA Certification was faxed to Sedgwick on August 11, 2019.  Transcript, RE 23-2, Page ID # 583-84; New FMLA Paperwork, RE 23-29, Page ID # 701-03.  The form was an exact duplicate of the prior certification except that it included a duration through December 28, 2019 and bore the initials "RW" next to the duration entries and next to the doctor's signature with a new date of "08-10-2019."  *Id*. After checking with Dr. Walker, Sedgwick notified Anne Stebbins that Dr. Walker denied making the edits to Appellant's form or initialing the changes. Transcript, RE 23-30, Page ID # 709-10.  However, Ms. Stebbins never even inquired to Sedgwick as to where the fax came from or whether it could find out.  *Id*.

Stebbins alerted JNAP Labor Relations about the information received from Sedgwick and prepared questions for them to ask Appellant about her role in the matter. Transcript, RE 23-30, Page ID # 709; Interview Notes, RE 23-31, Page ID # 713-14.  Appellant was interviewed by Arkena Willis of JNAP Labor Relations. Transcript, RE 23-26, Page ID # 679.   Appellant denied that she made the changes to the form and stated that the forms were left at the doctor's office.  Interview Notes, RE 23-31, Page ID # 713-14. Appellant was suspended following her

interview on August 24, 2019 while her responses were reviewed. Suspension, RE 23-32, Page ID # 716.

Appellee FCA concluded that Appellant altered the FMLA form. Her employment was terminated on August 28, 2019 for submitting a false FMLA Certification, which violates Company Standards of Conduct. Specifically Standard No. 1 prohibits "providing false and/or misleading information to the Company." Transcript, RE 23-2, Page ID # 585; Termination Letter, RE 23-33, Page ID # 718.  The termination decision was made by JNAP Labor Relations Supervisor Shera Capers after conferring with Stebbins at Corporate. Transcript, RE 23-26, Page ID # 689.   However, the only reason Stebbins articulated for the conclusion that Appellant submitted the paperwork was that the doctor stated he did not make changes, which has not informative of where the papers were submitted from.  Transcript, RE 23-30, Page ID # 710.  In fact, Appellee FCA never inquired into where the fax was received from or whether they could even find out. Transcript, RE 23-30, Page ID # 709.

Subsequently, Appellant filed this action on January 28, 2020 against Appellee for disparate treatment, retaliation, and failure to accommodate under both the Americans with Disabilities Act, 42 U.S.C. 126 § 12101, *et seq* (ADA) and the Michigan Persons with Disabilities Civil Rights Act M.C.L § 37.1101. Complaint, RE 1, Page ID # 1-10.  Following the close of discovery, Appellee filed

a Motion for Summary Judgment as to all of Appellant's claims pursuant to Fed. R. Civ. P. 56. Appellee's MSJ, RE 20, Page ID # 244-79. The District Court waived oral arguments and issued an Opinion and Order granting Appellee's Motion for Summary Judgment. Opinion and Order, RE 27, Page ID # 741-55.

## II. SUMMARY OF THE ARGUMENT

When the District Court granted Appellee's Motion for Summary Judgment, the District Court did not view the evidence and draw all inferences in favor of Appellant. Appellant was disabled, Appellee knew of her disability and yet Appellee refused to provide her with reasonable accommodations. Appellant was mistreated on a regular basis and her work environment only got worse after she complained of her mistreatment. As explained below, there is a genuine dispute as to material facts for each of Appellant's claims and Appellee's Motion for Summary Judgment should have been denied.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248; 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id*.

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587; 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325; 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## IV. ARGUMENT

Appellant alleges disparate treatment (Counts I and IV), retaliation (Counts II and V), and failure to accommodate (Counts III and VI) in violation of the ADA and PWDCRA.

## A. Appellee FCA Failed To Accommodate Appellant

"'The thesis of the [ADA] is simply this: That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have.'" *Smith v. Chrysler Corp*., 155 F.3d 799, 805 (6th Cir. 1998) (quoting 136 Cong. Rec. S 7422-03, 7347 (daily ed. June 6, 1990) (statement of Sen. Harkin)) (alteration in original). The ADA thus serves to "prohibit employers

16

from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998) (holding that an employer may require an HIV test for a food-handling employee who works with knives as part of an individualized inquiry into the existence of a health or safety risk). The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, but not always, resolve the plaintiff's PWDRA claim." *Donald v. Sybra, Inc*., 667 F.3d 757, 764 (6th Cir. 2012); *Swann v. Washtenaw County*, 221 F. Supp. 3d 936, 940 (E.D. Mich 2016).

The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position. In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question. See, e.g., *Estate of Mauro v. Borgess Med. Cen.*, 137 F.3d 398 (6th Cir.) (conducting an individualized inquiry into the plaintiff's specific situation to determine whether HIV-positive surgical technician was otherwise qualified for his position despite his medical condition), cert. denied, 525 U.S. 815, 119 S. Ct. 51, 142 L. Ed. 2d 39

(1998); *Wilson v. Chrysler Corp*., 172 F.3d 500, 505 (7th Cir. 1999)(stating that "the ADA requires an individualized inquiry into the ability of the employee to perform a particular job").  Indeed, the Supreme Court in recent cases has again made clear that such an individualized determination -- one which focuses on the medical condition's actual effect on the specific plaintiff -- lies at the heart of the ADA. See *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 2147, 144 L. Ed. 2d 450 (1999) (holding that mitigating or corrective measures must be taken into account in judging whether an individual possesses a disability because doing otherwise would "run[] directly counter to the individualized inquiry mandated by the ADA"); *Albertson, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999)(holding that the ADA imposes a statutory obligation to determine the existence of disabilities on a case-by-case basis, based upon the actual effect of the impairment on the life of the individual in question).

An employee informing an employer of a need for accommodation triggers an "employer's obligation to participate in the interactive process of determining one."  See *Richards v American Axle & Manuf'g, Inc*, 84 F. Supp. 2d 862, 872 (ED MI, 2000), quoting *Taylor v Principal Financial Group, Inc*, 93 F3d 155, 165 (CA 5, 1996); *Hendricks-Robinson v Excel Corp*, 154 F3d 685, 693 (CA 7, 1998)(once an employee informs employer of disability, the employer must engage in a "flexible, interactive process . . . so that, together, they might identify the

employee's precise limitations and discuss accommodations which might enable the employee to continue working."); *see also Howard v Mich Dep't of Corrections*, ___NW2d___; 2013 Mich. App. LEXIS 844, at *19-20 (Ct App, May 21, 2013)(an employee brought claims for disability discrimination under the ADA and PWDCRA and after the Court analyzed the plaintiff's ADA claim, including the defendant's failure to engage in an interactive accommodation process, it then applied that same logic and holding to the plaintiff's PWDCRA claim.) Opinion, RE 23-34, Page ID # 720-27.

To establish a *prima facie* case of failure to accommodate, Appellant must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) her employer failed to provide the necessary accommodation. *Hurtt v. International Services, Inc*., 627 Fed. App'x 414, 419 (6th Cir. 2015); *Whitfield v. Tennessee*, 629 F.3d 253, 259 (6th Cir. 2011).

"Disability" is defined as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C.A. §12102(2)(A-B).[1]    Even if a person does not meet the definition of

---

[1] The PWDCRA defines disability as a "determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional

"disability", there are two other ways they can be protected under the act.  First, an individual is considered "disabled" if he or she has a record of an impairment that substantially limits a major life activity.  29 CFR §1630.2(k)(1). When looking at the "record of" inquiry, it is not relevant if the impairing condition is in remission or under control.  *School Bd of Nassau Co v Arline*, 480 U.S. 273, 107 S. Ct. 1123; 94 L. Ed. 2d 307 (1987).

Second, if an individual does not meet the first two definitions of having a disability, an individual will still be considered disabled if he or she is "regarded as" being disabled.  PWDCRA's definition of a handicap includes "*being regarded as having a determinable physical or mental characteristic*" that "substantially limits 1 or more of the major life activities of that individual . . . ." MCL 37.1103(e)(emphasis added).   When an employer discriminates against an employee because the employer perceives the employee as handicapped, the employer is in violation of the PWDCRA. See *Sanchez v Lagoudakis*, 440 Mich. 496; 486 N.W.2d 657 (1992), (*On Remand*) 217 Mich. App. 535; 552 N.W.2d 472 (1996), rev'd on other grounds (*After Remand*) 458 Mich. 704; 581 N.W.2d 257 (1998).

---

disorder [that] substantially limits 1 or more of the major life activities of that individual." MC.L.A. § 37.1103(d)(I)(A).

### 1.    Appellant's Carpal Tunnel Syndrome Qualifies As A Disability

Appellant will briefly touch on this issue as it is clear that the carpel tunnel syndrome Appellant suffered from is a disability and that it clearly limits one or more of Appellant's major life activities.   However, the District Court did not reach a ruling on this issue.   This is not a case of some benign health issue or cancer remission where even then, Courts have found that there is a question of fact whether a condition counts as a disability even if it is not actively causing issues at the time of the adverse employment action. *Keller v BD of Educ*., 182F. Supp. 2d 1148, 1155 (D.N.M. 2001)(finding genuine issues of material fact as to whether former employee whose breast cancer was in remission was substantially limited in the life activities of working, walking, and caring for herself for a sufficient duration so as to be considered disabled, precluded summary judgment on employee's ADA claim).

In this case, Appellant's carpal tunnel syndrome interfered with her ability to get dressed, holding things, open doors, doing her hair, and cook.  Transcript, RE 23-2, Page ID # 540.  At various times, Appellant was restricted from lifting more than five pounds, "gripping", and could not work at all for two full months due to her carpal tunnel syndrome and its treatment.

Further, there is certainly record of Appellant suffering from a disability or was regarded as having a disability.  She went to Appellee's medical department at

least 19 times for issues related to her carpal tunnel, submitted copious amounts of medical records to Appellee FCA, and informed Appellee of her limitations and pains on an almost daily basis.  She had to leave her job to go to medical.  At minimum, there is a question of fact whether Appellant was disabled or had a record of disability.

### 2. Appellant Was Qualified For Her Position.

The District Court did not reach this issue in its opinion but there is a question of fact whether Appellant was "otherwise qualified" for the position. In order to be "otherwise qualified" for a job, an individual must satisfy the requisite skill, experience, education and other requirements of the job the individual holds or desires and be able, with or without reasonable accommodation, to perform the essential functions of the job. *Cummings v. Dean Transp., Inc.*, 9 F. Supp. 3d 795, 801 (E.D. Mich. 2014). An employee "who cannot perform the essential functions of a job is not qualified, and in such cases, the ADA does not come into play." *Id*. at 802 (citing *Dietelbach v. Ohio Edison Co.*, 1 Fed. App'x 435, 436-37 (6th Cir. 2001)).

Appellant worked for Appellee for over three years while suffering from carpal tunnel syndrome and being on various restrictions.  When Appellant worked on the line, Appellant could do three out of the four jobs for her team.  Transcript, RE 23-2, Page ID # 573.  Appellant was told that she could do her job as long as

she could do at least three out of the four jobs.  *Id.*  She worked for years without issue and was not fired for an inability to do her job.  It is ludicrous for Appellee FCA to now claim that during that entire time, Appellant was unqualified.

### 3. Appellant Requested To Be Accommodated And Her Employer Failed To Provide A Necessary Accommodation

Although Appellant must request and accommodation, "[a] request as straightforward as asking for continued employment is a sufficient request for accommodation."  *Hendricks-Robinson v Excel Corp*, 154 F3d 685, 694 (CA 7, 1998).  In this case, Appellant submitted several restrictions from her doctors that allowed her to do her job with certain accommodations, such as not using a heavy duty drill and not lifting over five pounds.  Appellant continued to want to work and submitted paperwork to allow her to work as long as her restrictions were accommodated.  Once she submitted the paperwork to return to work, this triggered a duty for Appellee FCA to engage with Appellant in an interactive accommodation process.  See *Richards v American Axle & Manuf'g, Inc*, 84 F. Supp. 2d 862, 872 (ED MI, 2000).  This was never done in Appellant's case.

Instead, Appellant had to go in each day and argue with Ms. Reed regarding being accommodated and involve the union and operations manager to get her needs met.  It is clear that when Appellant was able to work the jobs to which she was restricted, she could easily do her job and meet its essential functions.  There were months where Appellant did her job without an issue.  However, as explained

above, Appellee regularly failed to meet her accommodations and would place her in jobs outside of her restrictions, which would cause Appellant to complain and again have to seek medical.

Further, Appellee FCA sent Appellant home on numerous occasions for extended periods of time due to no work being available within her restrictions. However, Appellee FCA never even engaged Appellant in an interactive process to determine exactly what jobs she could do or what was available and, instead, left the decision to Appellant's line-level supervisor, who would send Appellant home on a whim. There is a question of fact whether Appellee FCA failed to accommodate Appellant.

## B.    Appellant Can Establish Disability Discrimination And Retaliation

Appellant claims she was disparately treated on the job and ultimately terminated because of her disability. To establish a *prima facie* case of disparate treatment discrimination, Appellant must prove: (1) she has a disability; (2) she is otherwise qualified for her job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. Appellant's disability must be a "but for" cause of her adverse treatment and termination to meet this third element. *Lewis v. Humboldt Acquisition Corp*., 681 F.3d 312, 321 (6th Cir. 2012) (en banc).  To state a *prima facie* retaliation claim, Appellant must show: (1) that she engaged in statutorily protected activity; (2) the employer knew

of that activity; (3) the employer took an adverse action against the Appellant; and, (4) there was a causal connection between the protected activity and the adverse action. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *Bryson v. Regis Corp*., 498 F.3d 561 (6th Cir. 2007).

If Appellant can meet each of the *prima facie* elements, the burden of production shifts to Appellee to articulate a legitimate, non-discriminatory justification for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Several courts have stated that a plaintiff may establish pretext by proving showing that (1) the reasons had no basis in fact; (2) if they have a basis in fact, they were not the actual factors motivating the decision; or (3) if they were factors, they were insufficient to justify the decision. *Johnson v Kroger Co*, 319 F3d 858 (6th Cir 2003); *Feick v County of Monroe*, 229 Mich App 335, 343, 582 NW2d 207 (1998). The *McDonnell Douglas* prima facie case is based on the conclusion that discriminatory motive "can in some situations be inferred from the mere fact of differences in treatment." *International Bhd of Teamsters v United States,* 431 US 324, 335 n15 (1997). If Appellee meets this requirement, the burden shifts back to Appellant to show that the reason asserted is mere pretext for unlawful retaliation. *Hurtt*, 627 Fed. App'x at 419; *Peden v. City of Detroit*, 470 Mich., 195, 205 (2004).

### 1. Appellant Suffered An Adverse Employment Action

A plaintiff suffers an adverse employment action where there is evidence that the employee was "fired" or received "a less distinguished title, **a material loss of benefits**, **significantly diminished material responsibilities**, **or other indices that might be unique to a particular situation**." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). In this case, Appellant suffered adverse employment actions that go beyond her firing. As outlined above, she was made to work jobs that were outside of her restrictions, she was yelled at, forced to leave the line to go to medical, made to do the jobs of multiple people without additional pay, and sent home without pay on several occasions. Setting aside the fact that Appellant was terminated, the ultimate adverse employment action, any of the other harassment she suffered also qualifies. As such, there is a question of fact whether Appellant suffered an adverse employment action beyond her firing.

### 2. Appellant Engaged In Known Protected Activity

Appellant complained verbally to human resources that her disability was not being accommodated and that she was subject to harassment from Ms. Reed. She submitted written statements, grievances, and an EEOC complaint alleging discrimination based on her disability throughout her employment.

### 3. Appellee's Actions Were Pretext

There is no justification that has been given for the horrendous treatment Appellant suffered outside of her firing.  In fact, Ms. Reed specifically told Appellant that she would not be able to work if she sought restrictions.  Further, when Appellant was able to work within her resitrictions, she had not issues whatsoever.  There can be no justification for the treatment she suffered at the hands of Ms. Reed and, indeed, Appellee FCA does not justify it in its Motion.

Further, Appellant's termination is pretext.  Appellant did not alter the information on the medical form.  Appellee's full investigation included interviewing Appellant, who denied the charge.  Appellee FCA did not even check to see where the fax originated from.  A simple check if its machine or an inquiry to Sedgwick would have shown that Appellant did not send the fax and, therefore, did not falsify any information.  It does not even make sense for Appellant to have forged the documentation since she was working a job that was not demanding and she had no reason not to wait for the doctor to update her forms.  There is just simply no reason why Appellant should have been fired.  As such, there is a question of fact whether Appellee's proffered reason for terminating Appellant was pretext and not because of her disability or in retaliation for her complaints of discrimination.

## V. CONCLUSION

WHEREFORE, Appellant respectfully requests that this Honorable Court enter an Order reversing the District Court's grant of Appellee's Motion for Summary Judgment, reopen this case, and allow it to proceed.

Respectfully submitted,

*/s/ Stephen M. Lovell*
Stephen M. Lovell (P80921)
Attorneys for Appellant
645 Griswold Street, Ste. 4100
Detroit, Michigan 48226
(313) 965-5555 /f (313)965-5556
stephen@ecllawfirm.com

July 13, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2022, I presented the foregoing paper to the above listed attorneys of record via electronic filing.

*/s/ Janine Wilson*
Janine Wilson

## **ADDENDUM**

Transcript, RE 23-2, Page ID # 535-584

Return to Work Note, RE 23-3, Page ID # 589-592

Transcript, RE 23-4, Page ID # 593-603

Return to Work Note 08/19/16, RE 23-5, Page ID # 604-605

08/23/16 FMLA, RE 23-6, Page ID # 606-608

01/26/17 Physical Status Report, RE 23-7, Page ID # 609-610

06/13/17 FMLA, RE 23-8, Page ID # 611-612

Work Injury Statement, RE 23-9, Page ID # 613-614

03/12/18 Statement, RE 23-10, Page ID # 615-617

Medical Encounters, RE 23-11, Page ID # 618-625

03/16/18 Statement, RE 23-12, Page ID # 626-627

03/16/18 Doctor's Note, RE 23-13, Page ID # 628-629

03/26/18 Return to Work Note, RE 23-14, Page ID # 630-631

06/14/18 Statement, RE 23-15, Page ID # 632-635

06/18/18 Return to Work Note, RE 23-16, Page ID # 636-637

06/20/18 FMLA, RE 23-17, Page ID # 638-654

08/23/18 Statement, RE 23-18, Page ID # 655-656

09/13/18 Statement, RE 23-19, Page ID # 657-659

09/21/18 Return to Work Note, RE 23-20, Page ID # 660-661

EEOC Charge, RE 23-21, Page ID # 662-663

11/14/18 Statement, RE 23-22, Page ID # 664-666

Grievance, RE 23-23, Page ID # 667-668

03/20/19 Return to Work Note, RE 23-24, Page ID # 669-670

Email Regarding Leave, RE 23-25, Page ID # 671-673

Transcript, RE 23-26, Page ID # 674-682

Transcript, RE 23-27, Page ID # 683-692

08/01/19 FMLA, RE 23-28, Page ID # 693-699

New FMLA Paperwork, RE 23-29, Page ID # 700-703

Transcript, RE 23-30, Page ID # 704-711

Interview Notes, RE 23-31, Page ID # 712-714

Suspension, RE 23-32, Page ID # 715-716

Termination Letter, RE 23-33, Page ID # 717-718

Opinion, RE 23-34, Page ID # 719-727