**NOT RECOMMENDED FOR PUBLICATION**

No. 22-1387

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 20, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ANTOINETTE BUGGS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| FCA US, LLC, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

O R D E R

Before: NORRIS, MOORE, and GILMAN, Circuit Judges.

Antoinette[1] Buggs appeals the judgment of the district court in her employment-discrimination action against FCA US, LLC (FCA). The parties have waived oral argument, and this panel unanimously agrees that oral argument is not needed. *See* Fed. R. App. P. 34(a).

I

A

Buggs's affiliation with FCA, the American subsidiary of Stellantis N.V., which manufactures Chrysler, Dodge, Jeep, and Ram automobiles, began in June 2015 when she started working as a temporary part-time assembly-line employee at the Jefferson North Assembly Plant (JNAP) in Detroit. She worked on a team assigned to the door line and was often assigned to a panel-secure job that involved using a hand drill to secure panels into car doors. She sometimes worked the door-tester job, which also required the use of a smaller hand drill.

[1] Buggs is referred to as "Antionette" throughout the summary-judgment record.

Buggs began experiencing pain in her hands and sought medical treatment on July 27, 2016. Her physician identified a possible diagnosis of carpel-tunnel syndrome and provided a form stating that Buggs "is/was unable to perform *all* duties . . . from 7/26/16 through 7/27/16 and is able to return to work . . . with restrictions on 7/28/16." The form from her physician, also referred to as a work slip, further stated that she was "able to perform only *restricted* duties from: 7/28/16 through 11/15/16." The restrictions included no "gripping, drilling, using hand tools." Her physician required that she follow up with a neurologist and a hand surgeon. Buggs brought this work slip to her supervisor and then to JNAP's medical department to give the work slip to an on-site doctor so that the doctor could input the information into JNAP's computer systems. Because she could not perform the panel-secure job at this time, she was not called into work for 30 days.

On August 19, 2016, Buggs received a formal diagnosis of bilateral carpal-tunnel syndrome. Her August 19, 2016, work slip stated that she was able to return to work immediately without any restrictions. Buggs testified that this was because she asked her doctor "to remove the restrictions" on that form "so [that she] would be able to work, because [she] was given a 30-day no work available form." But Buggs still was unable to perform and was ultimately "sent home for 30 days with no work available." Buggs's supervisor told her that she could not return until she had surgery on her hands. In late 2016, Buggs underwent surgeries on both of her wrists in order to continue her employment. Buggs returned to work in January 2017 without restrictions.

On March 5, 2018, Buggs was hired to be a regular full-time unionized employee, but she clashed frequently with her new supervisor, Donna Langford Reed. Reed initially tried to assign Buggs to other roles than the panel-secure job, such as the window-seal job. Buggs testified that she told Reed she could not place the windows because the task "aggravate[d her] hands" and she could not hold the glass. During this time, while working on the window-seal job, she visited the medical department, which provided her with over-the-counter medication and wrist wraps. She testified that on one occasion in March 2018, after discovering that she had left her braces (a wrist wrap with metal inside) at home, she attempted to get braces from the medical department for the day, but the medical department told her they could not see her and she would need to receive the

braces from a doctor the following day. Sometime after Buggs filed a voluntary statement with the union on March 12, 2018, concerning disputes about Buggs's ability to perform those roles, and before June 14, 2018, Buggs's union and management reached an agreement to keep her on the panel-secure job. Regular conflicts between Reed and Buggs continued, with Reed threatening various disciplinary actions against Buggs.

Buggs had a workplace restriction in place between March 26, 2018, and June 26, 2018, which prohibited her from gripping and using hand tools that weighed over five pounds. On June 14, 2018, Buggs submitted a voluntary statement to her union wherein she described an incident occurring on June 13, 2018. In short, when Buggs's drill stopped working, which caused the assembly line to shut down, Reed told her to use another drill that was heavier; Buggs told Reed that it was too heavy and the torque was too hard. Buggs wrote that "Donna never offered a smaller drill to use, I would've been okay with that but no accommodation was mentioned."

The deterioration of their relationship led Buggs to file a charge with the Equal Employment Opportunity Commission (EEOC) on September 19, 2018, alleging disability discrimination and retaliation by Reed. In Buggs's EEOC charge, Buggs stated that "[o]n June 14, 2018, I submitted a request for a reasonable accommodation due to my disability" and that she believes she was "denied a reasonable accommodation due to my disability." When asked about Buggs's reference to her accommodation request, Buggs testified that she believed her request was her June 14, 2018, voluntary statement that she gave to the union. Buggs testified that she never gave this voluntary statement to anybody in management.

During the course of her employment, Buggs sought intermittent leave under the Family and Medical Leave Act (FMLA) in case she became incapacitated by her health conditions. She was granted authorization for such leave on some occasions and denied it on others, though one application was denied based on not meeting employment-duration requirements.

After a temporary transfer to a position in the quality department that accommodated all of her restrictions and moved her out of Reed's supervisory purview, Buggs filed a new request for intermittent FMLA leave on July 31, 2019. Sedgwick, an outside firm that processes FCA's

FMLA matters, informed Buggs that her medical provider did not properly complete an FMLA provider-certification form because it did not identify a duration for the leave. It informed her that her physician needed to provide the required information by August 11, 2019, or her claim would be denied. Sedgwick then received by fax a corrected certification form, identical to the original submission but now identifying a duration of intermittent leave through December 28, 2019, as well as the inclusion of "08-10-2019" and "RW," apparently the initials of Buggs's physician, Dr. Robert Walker, near the form's signature block. Dr. Walker denied making those changes in a handwritten statement dated August 21, 2019, and Sedgwick accordingly informed Anne Stebbins, an FMLA administrator at FCA's corporate headquarters, of Dr. Walker's denial.

Stebbins forwarded the matter to JNAP's management, and Arkena Willis, an FCA human-resources official who apparently knew that Buggs had earlier filed the EEOC charge, interviewed Buggs on the matter. Buggs denied making the changes to the certification form but could not explain why Dr. Walker would also deny making the changes. Buggs was suspended following the interview. Shera Capers, an FCA labor-relations supervisor, conferred with Stebbins and determined that Buggs was responsible for making the changes to the certification form. FCA ended Buggs's employment on August 28, 2019, on the basis of "[p]roviding false and/or misleading information to the company," in violation of FCA's standards of conduct.

B

Buggs filed the complaint for this action in January 2020, raising claims of disability discrimination (Counts I and IV), retaliation (Counts II and V), and failure to accommodate (Counts III and VI) under both the federal Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, and Michigan's Persons with Disabilities Civil Rights Act, Michigan Compiled Laws §§ 37.1101-1607. The complaint initially named both FCA and Reed as defendants, but the parties later stipulated to Reed's dismissal as a party.

Following the close of discovery, FCA filed a motion for summary judgment on all of the pending claims. The district court waived oral arguments and, based on the briefs, granted the motion and entered judgment in favor of FCA. Buggs filed a timely notice of appeal.

II

A

We review de novo the district court's grant of summary judgment. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate if the movant can demonstrate that no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The record must be viewed in the light most favorable to the nonmovant, and "credibility judgments and weighing of the evidence are prohibited." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009). A genuine dispute of material fact exists if there is sufficient evidence, when considered in the light most favorable to the nonmovant, for a reasonable jury to find for the nonmovant. *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). If the movant has identified an absence of a genuine dispute of material fact, the nonmovant cannot rely only on the pleadings and must designate specific facts showing that there is a genuine issue for trial as supported by affidavits, depositions, answers to interrogatories, and admissions on file; this is especially so when parties have had an opportunity for discovery. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

B

Michigan's Persons with Disabilities Civil Rights Act substantially mirrors the federal Americans with Disabilities Act, and resolution of the federal-law claim will generally resolve the state-law claim. *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012). Neither party argues that the state-law claims should be analyzed differently from the federal-law claims, and we will assume that resolution of the federal-law claim resolves the state-law claim in the same manner.

In order to establish a prima facie case of disability discrimination, a plaintiff must demonstrate that she (1) has a disability, (2) "is otherwise qualified to perform the essential functions of a position, with or without accommodation," and (3) suffered an adverse employment action because of the disability. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). When the discrimination claim relies on circumstantial evidence, the plaintiff must first establish a prima facie case of discrimination before the burden shifts to the employer to rebut that prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The

employer can rebut the prima facie case by articulating a legitimate, non-discriminatory reason for the adverse employment action; the plaintiff then has the burden to demonstrate that the reason articulated by the employer was a pretext designed to mask discrimination. *Id.* at 802-04.

On appeal, FCA does not contest that Buggs can make a prima facie case for disability discrimination, though it argues in a footnote that the sole materially adverse action to which Buggs can point is her termination. Appellee's Br. at 15-16, 16 n.4. An adverse employment action is a "materially adverse change in the terms or conditions of employment because of the employer's actions." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quoting *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999)). Buggs states in her brief that termination of her employment was not the only adverse action that she suffered during her tenure with FCA, pointing to her experiences working under Reed's supervision and being "sent home without pay on several occasions." Appellant's Br. at 26. We agree with FCA on this point. Buggs did not develop arguments with regard to these other actions before the district court or this court and instead raises them in only a perfunctory manner, without any evidentiary or legal support. *United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999). For example, Buggs does not direct the court to any record evidence that she was sent home without pay. It appears from her deposition that she *might* have been referring to being placed on "no available work" status, but that is far from clear. And Buggs provides no information about FCA's "no work available" policy or makes any legal arguments that being placed on "no work available" status constitutes an adverse employment action. With such an undeveloped record, we cannot speculate as to the arguments. *See id.* The same is true of Buggs's other argument regarding Reed's treatment of her. But, even so, such a materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities," and we have often found that harsh words in a confrontational setting do not constitute a materially adverse change. *Michael*, 496 F.3d at 594. Reed's treatment of Buggs did not rise to the level of a materially adverse change. The only materially adverse change here is the termination of employment.

FCA's brief on appeal begins by addressing pretext, so we will assume Buggs's prima face case. The district court accepted FCA's proffered legitimate nondiscriminatory reason for terminating Buggs (altering the FMLA form) and then determined that Buggs did not show a genuine dispute of fact with regard to pretext. We agree; FCA proffered a legitimate nondiscriminatory reason, and Buggs failed to make the requisite showing with regard to pretext. When considering pretext, we ask, in essence, whether the district court correctly determined that no genuine dispute of fact existed as to *why* FCA fired Buggs. In order to demonstrate that the employer's stated reason for the adverse employment action is pretextual, the plaintiff must show that the proffered reason (1) has no basis in fact, (2) did not motivate the adverse action, or (3) was insufficient to warrant such adverse action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

Once a plaintiff has offered evidence of pretext, a defendant has "one last opportunity . . . to prevail on summary judgment . . . and may rebut the plaintiff's evidence of pretext[] by demonstrating that the defendant's actions, while perhaps mistaken, foolish, trivial, or baseless, were not taken with discriminatory intent." *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714-15 (6th Cir. 2007) (internal quotation marks omitted). "If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent" and the action cannot be pretextual. *Id.* at 715 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). Thus, the employer must point to specific facts that it had at the time demonstrating that it "reasonably and honestly relie[d] on particularized facts in making an employment decision." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 322 (6th Cir. 2019) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009)). At this point, "the employee has the opportunity to produce 'proof to the contrary.'" *Clay*, 501 F.3d at 714 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-08 (6th Cir. 2006)). Though "an employee's *bare assertion* that the employer's proffered reason *has no basis in fact* is insufficient to call an employer's honest belief into question, . . . an employee can still overcome the 'honest belief rule' by pointing to evidence that

the employer failed to make a *reasonably informed* and considered decision before taking its adverse employment action." *Babb*, 942 F.3d at 322 (quotations and citations omitted).

FCA claims that it terminated Buggs "because it concluded that she falsified dates and her doctor's initials on an FMLA provider certificate." Appellee's Br. at 16. Buggs argues that this is pretextual because: (1) she denied altering the certificate when asked about it during the investigation before her termination and during her deposition, (2) the investigation was bare-bones and FCA neither took seriously her denial nor checked to see where the fax originated from, and (3) she lacked a motive or reason to alter the certificate form because she was working in the quality department in a position that was "not demanding." *See* Appellant's Br. at 27.

Though Buggs's testimony that she did not alter the certificate form might have given rise to a genuine dispute of material fact as to the accuracy of FCA's proffered reason, FCA carried its burden under the honest-belief rule by offering evidence that it reasonably relied on particularized facts that were before it at the time. *Clay*, 501 F.3d at 713-14. The record shows that the discharge process began when Sedgwick, FCA's third-party FMLA administer, informed a person at FCA's headquarters—not at JNAP (Buggs's work location)—about a discrepancy in the latest FMLA certification forms that Buggs had submitted for intermittent leave. FCA points to evidence that, during the investigation, Buggs's physician, Dr. Walker, confirmed in a signed writing that he had not made the alterations. Personnel at FCA headquarters, specifically Stebbins, then pursued the matter with JNAP management to interview Buggs. Though Buggs denied making the alterations to Willis, who was apparently aware of the EEOC charge that Buggs had filed while under Reed's supervision, both the determination that Buggs was responsible for the alterations to the certification form and the decision to terminate Buggs's employment were made by Capers, a JNAP labor-relations supervisor, in consultation with Stebbins; the record does not show that Capers or Stebbins had any significant prior role in affecting Buggs's employment relationship with FCA.

To be sure, FCA's investigation of the certification form was hardly comprehensive; no one apparently investigated the possibility that a member of Dr. Walker's office staff had altered

the certification form without his knowledge. "We have not required that the employer's decision-making process under scrutiny 'be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Seeger*, 681 F.3d at 285 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). The suspension report and termination letter indicate that, when presented with Dr. Walker's written statement that he had not initialed and dated the form, FCA accepted Dr. Walker's version of events over Buggs's. That belief could be mistaken, but our caselaw makes clear that a mistake under these circumstances is not enough. Thus, the district court did not err by granting summary judgment on the disability-discrimination claim in favor of FCA because there is no genuine dispute of material fact that FCA terminated Buggs's employment based on an honest belief that supported a legitimate, non-discriminatory reason.

C

Both federal and state law prohibit an employer from discriminating against an employee because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the relevant statutes. 42 U.S.C. § 12203(a); Mich. Comp. Laws § 37.1602(a). The *McDonnell Douglas* framework applies if, like here, the retaliation claim relies on circumstantial evidence. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). In order to establish a prima facie case of retaliation, the plaintiff must demonstrate that (1) the plaintiff engaged in a statutorily protected activity, (2) the employer knew of that protected activity, (3) the employer took an adverse employment action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action. *Id.*; *Bachman v. Swan Harbour Assocs.*, 653 N.W.2d 415, 437 (Mich. Ct. App. 2002). "In the retaliation context, the term 'adverse employment action' encompasses more than just actions that affect 'the terms, conditions or status of employment.'" *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008)). An adverse employment action in this context is one that "well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted).

Buggs identifies the protected activities here to be the EEOC charge, the voluntary statements filed with the labor union, and complaints with JNAP's human resources, and she states that FCA knew of these activities. But, both before the district court and before this court, Buggs did not argue or offer any evidence to support that there was a causal connection between her protected activity and the alleged adverse actions, thus failing to make out a prima facie claim for retaliation. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988) (finding forfeiture by failing to raise an argument before the district court); *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009) (explaining that forfeiture on appeal can occur when an argument is omitted in the appellate brief). Therefore, no genuine dispute of material fact exists with respect to the causation component of the retaliation claim. And even if Buggs could make out a prima facie case of retaliation, she runs into the same problem that dooms the disability-discrimination claim—FCA asserted a legitimate, non-discriminatory reason for ending her employment based on an honest belief that the certification form had been altered, and Buggs failed to present a genuine issue of material fact regarding pretext. In sum, the district court did not err in granting summary judgment on the retaliation claim.

D

An employer must provide reasonable accommodations to an employee with a disability who is otherwise qualified for the position. *See* 42 U.S.C. § 12112(b)(5); Mich. Comp. Laws § 37.1102(2). In order to establish a prima facie case of a failure to accommodate, the plaintiff must demonstrate that (1) she had a disability "within the meaning of [the statute]"; (2) "she was otherwise qualified for" the position of employment, "with or without reasonable accommodation"; (3) the employer "knew or had reason to know" of the disability; (4) "she requested an accommodation"; and (5) the employer "failed to provide the necessary accommodation." *King v. Steward Trumbull Mem'l Hosp. Inc.*, 30 F.4th 551, 560 (6th Cir. 2022) (alteration in original) (quoting *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d

652, 669 (6th Cir. 2020)). "If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer." *Id.*

Buggs's physician diagnosed her with carpal-tunnel syndrome in 2016. Buggs testified that, because of her carpal-tunnel syndrome, she experiences pain when writing, holding items, and opening doors. She can barely cook, get dressed, or style her hair, and she does not have full range with her hands. Accordingly, a reasonable factfinder could find that Buggs has had an impairment that substantially limits her major life activities. *See Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106-07 (6th Cir. 2008). Further, a qualified individual is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The record indicates that, at various points in time, Buggs continued to perform her duties despite her carpal-tunnel syndrome, she improved her performance when various restrictions were addressed, and FCA, knowing of her disability, continued to place Buggs on numerous teams without questioning her performance. FCA also did not terminate Buggs because of her performance or a purported lack of qualifications, but rather because of its conclusion that she altered her FMLA certificate form. On appeal, FCA does not raise arguments with regard to these elements.

Buggs runs into a problem, however, with regard to her ability to show that she requested an accommodation and that FCA failed to accommodate her. Buggs argues that she requested an accommodation by asking for continued employment and by submitting restrictions from her doctors that identified activities she needed to avoid, such as using heavy drills or lifting over five pounds. Appellant's Br. 23-24. The record indicates that, beginning in July 2016, when Buggs began experiencing hand pain, Buggs submitted a number of doctors' notes outlining similar restrictions for non-continuous periods of time, Buggs requested medical leave for her carpal-tunnel syndrome, told FCA that she could not perform certain activities because of her carpal-tunnel syndrome, and visited the medical department for "wrist wraps, biofreezes, and over-the-counter medication." Appellant's Br. at 4. Buggs wrote in her EEOC charge that she requested and was denied a reasonable accommodation on June 14, 2018, referring to her voluntary statement

to the union that "Donna never offered a smaller drill to use, I would've been okay with that but no accommodation was mentioned." Buggs testified that she gave this voluntary statement only to the union; she never directly provided the voluntary statements to management. It was up to the union to determine whether to file a grievance with FCA, and it did not do so.

It is true that an employee's request for accommodations may be inferred by interactions and context. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) ("The employee is not required to use magic words such as 'accommodation' and 'disability'; rather, we ask whether 'a factfinder could infer that [the interaction] constituted a request for an accommodation.'") (alterations in original) (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004))); *Smith*, 376 F.3d at 535 (finding that a request for reasonable accommodations could be inferred from the employee's letter asking to delegate duties to another employee given the employer's awareness of disability). But that is not the case from this record; Buggs has not shown what accommodation she specifically wanted and was denied. And Buggs testified that she never provided her voluntary statements—which she identified as her accommodation request—to FCA.

Even so, "[t]o provide a reasonable accommodation, an employer may be required to modify the responsibilities of a disabled employee's existing job or transfer the employee to a vacant position with different responsibilities," but eliminating essential functions of the position is not a reasonable accommodation. *Rorrer*, 743 F.3d at 1039. FCA argues that it placed Buggs on various different teams on the assembly line, permitted Buggs to take medical leave, and provided her with a temporary position off the assembly line when it became available. Buggs argues that this was sporadic and left her without any accommodations for various periods of time. But FCA was required by a collective-bargaining agreement to respect the access that other employees had to certain job assignments based on their seniority, considering Buggs's shorter tenure. Nonetheless, FCA assigned Buggs to a position in the quality department that accommodated all of her workplace restrictions at the time that Buggs lost her employment. There is no genuine dispute of material fact as to whether Buggs requested a reasonable accommodation

that FCA failed to provide; accordingly, summary judgment was appropriately granted on the claim that FCA failed to accommodate Buggs's disability.

III

We therefore **AFFIRM** the judgment of the district court.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk